IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

Case No. 1:23-cv-8400

MICHAEL GRECCO
PRODUCTIONS, INC.,

    Plaintiff,

v.

MICHAEL DONOVAN,

    Defendant.

## COMPLAINT

Plaintiff Michael Grecco Productions, Inc. ("Plaintiff") sues defendant Michael Donovan ("Defendant"), and alleges as follows:

## THE PARTIES

1. Plaintiff is a corporation organized and existing under the laws of the State of California with a principal place of business at 3103 17th Street, Santa Monica, CA 90405.

2. Defendant is an individual who is a citizen of the State of New York residing at 453 West 24th Street, New York, NY 10011.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

4. This Court has jurisdiction over Defendant because he maintains sufficient minimum contacts with New York such that the exercise of jurisdiction over him would not offend traditional notions of fair play and substantial justice.

5. Venue properly lies in this district pursuant to 28 U.S.C. § 1400(a) because

Defendant or his agents reside or may be found in this district. "A defendant 'may be found' wherever that person is amenable to personal jurisdiction." Cavu Releasing, LLC. v. Fries, 419 F. Supp. 2d 388, 394 (S.D.N.Y. 2005). In other words, "[v]enue is proper in his District because the defendants are subject to personal jurisdiction in this District." Noble v. Crazetees.com, 2015 U.S. Dist. LEXIS 130508, at *9 (S.D.N.Y. July 16, 2015).

## FACTS

### I. Plaintiff's Business and History

6. Plaintiff is a celebrity photography agency, owned and operated by award-winning photojournalist Michael Grecco, that is hired by top-tier media outlets to take photographs of celebrities. Mr. Grecco has photographed legendary musicians, actors, directors, Olympians, technologists, comedians, athletes, fashion models and automobiles – such as Johnny Cash, Steven Spielberg, Will Smith, Chris Rock, Penelope Cruz, Steve Martin, Olympian Janet Evans, the SnapChat Founders, and Porsche's 911 sports automobile.

7. Mr. Grecco's photographs are widely published in some of the world's most prominent magazines, including but not limited to, *Vanity Fair*, *Rolling Stone*, *ESPN Magazine*, *Time*, Forbes and *Esquire*.

8. Using state-of-the-art equipment and signature lighting techniques, Mr. Grecco creates high-end photography licensed by some of the top publishers in this Country. When commissioned for a job, Mr. Grecco spends countless hours capturing hundreds of photographs and then processing those photographs to ensure they meet customers' requirements.

9. Plaintiff maintains a commercial website (https://grecco.com/) which describes the photography services offered by Mr. Grecco, hosts a sample portfolio of photographs taken and Cinemagraphs created by Mr. Grecco, and invites prospective customers to contact Plaintiff to arrange for a professional photo shoot.

10. Plaintiff owns the photographs and serves as the licensing agent with respect to licensing such photographs. Plaintiff was formed in 1998 as "Michael Grecco Photography, Inc." At that time, Mr. Grecco transferred the rights with respect to his existing copyrights (pursuant to a written assignment agreement) to Michael Grecco Photography, Inc. In 2012, the company name was formally changed to Michael Grecco Productions, Inc. to accommodate for the expansion into motion productions in addition to photography. Later, in 2014, Plaintiff created "Michael Grecco Photography" as a d/b/a of Plaintiff.

11. Plaintiff licenses its photographs on an exclusive and non-exclusive basis to top-tier media outlets. Plaintiff has licensed individual images of celebrities for thousands of dollars to major top-tier outlets.

## II.   The Work at Issue in this Lawsuit

12. In 2005, Plaintiff created a professional photograph of Steven Spielberg titled "Spielberg_K3U9277" (the "Work"). A copy of the Work is exhibited below:



3

13.     The Work was registered by Plaintiff with the Register of Copyrights on January 5, 2006 and was assigned Registration No. VAu 688-677. A true and correct copy of the Certificate of Registration pertaining to the Work is attached hereto as **Exhibit "A."**

14.     Plaintiff is the owner of the Work and has remained the owner at all times material hereto.

### III.     Defendant's Unlawful Activities

15.     Defendant is an individual who was founder and CEO of Outer Places LLC ("Outer Places"). Outer Places was a limited liability company organized under the laws of the State of Delaware. Outer Places was a media company that merged content and e-commerce, creating content to drive engagement through stories, information, and imagination and then focuses on monetization of the audience.

16.     Defendant is also co-founder, partner, and CEO of D/G 2, Inc. doing business as Donovan/Green ("Donovan/Green"), a corporation organized and existing under the laws of the State of New York. Donovan/Green is a brand strategy firm.

17.     Donovan Green developed a creative incubator that has launched three new businesses, the latest being Outer Places.

18.     Donovan Green showcases Outer Places on its website (at: https://dgtwo.com/outer-places/) as a case study of the work Donovan/Green provides, including "Satisfying an underserved demographic of over 150 millions users" and "Building an authoritative, relevant, resilient social media presence," which includes Instagram content, site engagement, video content, and article content.

19.     Defendant advertises/markets his business primarily through his website (https://www.outerplaces.com/ and https://dgtwo.com/), social media (e.g., https://www.facebook.com/OuterPlaces, https://www.facebook.com/dgtwo.nyc,

https://twitter.com/outerplaces, and https://twitter.com/dgtwo), and other forms of advertising.

20. On May 16, 2016 (after Plaintiff's above-referenced copyright registration of the Work), Defendant published a copy of the Work on his website (at https://www.outerplaces.com/science-fiction/item/12166-steven-spielberg-reveals-his-favorite-superhero-movie):



21. A true and correct copy of a screenshot of Defendant's website, webpage, and/or social media, displaying the copyrighted Work, is attached hereto as **Exhibit "B."**

22. Defendant is not and has never been licensed to use or display the Work. Defendant never contacted Plaintiff to seek permission to use the Work in connection with his business or for any other purpose.

23. Defendant utilized the Work for commercial use - namely, in connection with the marketing and advertising of Defendant's business.

24. Upon information and belief, Defendant located a copy of the Work on the internet and rather than contact Plaintiff to secure a license, simply copied the Work for his own commercial use.

5

## IV. Plaintiff's Timely Discovery of the Infringement

25. Through its ongoing diligent efforts to identify unauthorized use of its photographs, Plaintiff discovered Defendant's unauthorized use/display of the Work on February 16, 2021.

26. Plaintiff was reasonably diligent in discovering Defendant's unauthorized use of the Work and could not have discovered the unauthorized use sooner than it did.

### A. Plaintiff's large and extensive image library

27. As with many professional photographers, each photoshoot involves the taking of hundreds if not thousands of photographs. Plaintiff always retains copyright ownership of the photographic images that result from these photoshoots.

28. Mr. Grecco has been taking photographs for some forty years, so Plaintiff has an enormous library of images, estimated at over ten million.

29. After a photoshoot, Plaintiff's clients typically choose a subset of photographic images to be retouched and finalized. Plaintiff then provides that subset of images to the client with a non-exclusive license, in which the client's right to use is restricted in geographic scope, in temporal scope, by the number of uses, and/or by the type of use allowed.

30. Because of the extremely large number of images that are part of its library, Plaintiff cannot realistically conduct enforcement efforts on all of them. Instead, Plaintiff must make tough decisions about a much smaller subset of images to include in electronic search databases and reverse-image searches.

### B. Reverse-image search tools

31. Reverse-image searching is a content-based image retrieval technique that involves formulating a search query by providing a system with a sample image—rather than words or metadata—and having it return results based on that image.

32. There are reverse-image search engines that are publicly available, such as Google

Image Search and TinEye, and some that are privately developed and available only to subscribers for commercial use.

33. All reverse-image search engines are limited in their search capability. The limitations are manifested in two primary ways: (a) in the size and scope of the "index" of images that are being searched by the system, and (b) the "algorithm" being used to conduct the search.

34. *Index limitation*: No reverse-image search engine searches the entire World Wide Web (the "web"). Instead, each system uses its own index of images, which is created using confidential and proprietary methods that results in a smaller subset of the entire population.

35. Although the methods vary, it is widely understood that each system uses a combination of factors to find and index images, including without limitation: (a) the rank of the domain on which the image appears, (b) the rank of the page on which the image appears, (c) the amount of activity on the page on which the image appears, and (d) the recency of the activity on the page on which the image appears.

36. Therefore, broadly speaking, popular domains and pages, with lots of hits or with frequent changes to content, are more likely to get indexed than old, inactive pages on low-ranked domains.

37. Search indexes are small compared to the number of images available on the web. For example, the number of total images on the Internet is impossibly large. According to one report in 2014, 1.8 *billion* digital images are uploaded to the internet every single day—or 657 *billion* every year. By contrast, the last time an estimate was made available in 2010, Google Image Search—widely believed to be the largest reverse-image search index—had indexed only 10 billion images in the preceding 10 years.

38. Accordingly, many pages on the web may never be indexed for reverse image searching, in any system's index.

39. *Algorithm limitation*: Even if an image is indexed, a reverse-image search will return the result only if the system's algorithm can locate it.

40. Broadly speaking, reverse-image searching is using computer vision technology to match images based on similarities in textures, colors, shapes, and other content of the image. Each search system—whether publicly available or for private, commercial users—uses its own confidential and propriety algorithm for this process.

41. Whether an algorithm can locate an image on the Web based on a user's input will therefore depend on the quality of the system's algorithm. Other factors that affect search ability and results include: system limitations on file size or file type that can be used as search input; the quality of the image input by a user into the search engine, and the quality of the image on the web page that is indexed for search.

42. Because of the technological limitations described above, it is possible that a specific image on the Web might never be found despite reverse-image searching on multiple platforms or systems, or it might be found only after several years, as search-engine indexes grow in size and reverse-image search technology improves over time.

## C. Plaintiff's search process

43. Because Plaintiff owns over 10 million total images, it is not practical to conduct searches on all of them. Plaintiff has therefore had to select a smaller subset of images to include in searches.

44. Of the 10 million total images, about 15,000 are final re-touched images. Of those, Plaintiff has selected about 6,500 to include in its image library for licensing to the public. Plaintiff uses that library of approximately 6,500 images as a database on which to conduct reverse-image searches for copyright enforcement purposes.

45. The number of images included in Plaintiff's reverse-image search efforts has also

8

grown over time: as Plaintiff finds unauthorized uses of images not included in the search database, Plaintiff will add such images to the database. This usually happens by chance, or when a reverse-image search finds an image that is similar, but not identical, to the image already being searched.

46. Between about 2010 and 2021, as relevant to the claims here, Plaintiff used several reverse-image search systems in its efforts to enforce its copyrights against widespread infringement on the Internet:

    a. *Higbee & Associates*: the law firm of Higbee & Associates leases reverse-image search technology from third parties but maintains "sightings" or "hits" in a proprietary database and "portal" for its clients. Plaintiff used the Higbee service until 2021.
    b. *ImageRights*: a private, commercial service using a proprietary system for reverse-image searching the web. Plaintiff used ImageRights until mid-August 2018.
    c. *Google Image Search* and *TinEye*: Plaintiff also uses these publicly available reverse-image search engines to conduct manual searches.

**i. Higbee process**

47. The Higbee process is as follows: First, "sightings" or "hits" of Plaintiff's images are located by the algorithm using Higbee's system. Those sightings are maintained within the Higbee system, out of Plaintiff's view. Plaintiff has very limited access to unreviewed sightings.

48. On information and belief, at any given time, the Higbee system contains many thousand sightings of Plaintiff's images. For example, as of February 2020, there were nearly 33,000 sightings in the Higbee system.

49. Second, each sighting is reviewed internally (at Higbee), assigned a quality score, and determined whether it is viable for enforcement. If so, the sighting is sent into the client "portal" for Plaintiff to review, confirm it is an infringement, and approve the sighting for enforcement action.

50. Plaintiff's internal review includes verifying the image, determining that it is not

subject to a prior license or release, and making a preliminary assessment of fair use and DMCA safe-harbor protection.

51. Plaintiff has only three staff members—Michael Grecco himself, a studio manager (who also handles Plaintiff's bookings and legitimate licensing efforts), and an archivist—any of which may review and approve a Higbee sighting.

52. Finally, after Plaintiff approves, the sighting is returned to Higbee to be worked on by case workers and attorneys.

### ii. ImageRights process

53. Like the Higbee process, with ImageRights the system locates "sightings" or "hits" of Plaintiff's images using an algorithm. Unlike the Higbee process, ImageRights dumps all sightings into a portal for investigation and confirmation, and approval by Plaintiff.

54. Because ImageRights provides all sightings to Plaintiff, this results in an extremely large number of sightings that Plaintiff's small staff must vet. As of the time that Plaintiff stopped using ImageRights in August 2018, there were around 100,000 sightings that ImageRights provided to Plaintiff that needed to be investigated.

55. Each sighting produced by ImageRights must undergo the following a series steps to confirm whether it should be pursued for copyright enforcement: verifying that the sighting involves one of Plaintiff's images (i.e., it is not a "false positive"); investigating whether the sighting involves an image or a user that has a prior authorization, license, or release allowing the use of the image; preliminarily determining whether there is a viable fair-use defense to the use of the image; preliminarily assessing whether there is a DMCA safe-harbor defense to the use of the image; and determining whether the sighting involves an image or a user that has a connection to the United States.

56. Assessing whether a DMCA safe-harbor defense exists often requires extensive

research into the identity of the user (if it can be determined) and whether that user is acting on behalf of the website owner in posting the image.

57. Plaintiff has only three staff members who are responsible for vetting every one of the ImageRights sightings. Because the vetting process described above can be time-intensive, there is often a significant delay from when ImageRights dumps sightings data into a review portal until when Plaintiff actually becomes aware of the sighting and the potential infringement.

58. After Plaintiff completes its investigation of an ImageRights sighting, it is approved for enforcement and turned over to an attorney for handling.

### iv. Google Image Search and TinEye

59. Because Plaintiff has thousands and thousands of images, it is not feasible to use publicly available search engines like Google Image Search and TinEye to conduct comprehensive enforcement efforts on an entire image library. This is because images must be separately loaded into the search field of the engine one by one.

60. Plaintiff often uses Google Image Search and TinEye to supplement the results from the private reverse-image search engines that are part of its enforcement efforts. After a commercial system like ImageRights locates an infringement, Plaintiff's staff will often input the found image into Google Image Search and/or TinEye. Since different search engines often return different results, conducting supplementary searching in this manner will sometimes reveal more infringements.

### D. The discovery of the Work in this action

61. With respect to the Work, the above process worked as follows:

62. An employee of Plaintiff, aware that the Work is frequently infringed, on February 16, 2021, conducted a reverse-image search of the Work using Google Image Search and found Defendant's unauthorized use of the Work on Defendant's website.

63. Before February 16, 2021, a sighting of the Work on Defendant's website had not been pushed through to the Higbee portal for Plaintiff's review, confirmation, and approval.

64. Before February 16, 2021, the ImageRights system had not returned a "sighting" of the Image on Defendant's website.

65. Accordingly, Plaintiff was reasonably diligent in searching for and discovering Defendant's unauthorized uses of the Image.

66. Following Plaintiff's discovery, Plaintiff notified Defendant in writing of such unauthorized use. To date, Plaintiff has been unable to negotiate a reasonable license for the past infringement of its Work.

67. All conditions precedent to this action have been performed or have been waived.

## COUNT I – COPYRIGHT INFRINGEMENT

68. Plaintiff re-alleges and incorporates paragraphs 1 through 67 as set forth above.

69. The Work is an original work of authorship, embodying copyrightable subject matter, that is subject to the full protection of the United States copyright laws (17 U.S.C. § 101 *et seq.*).

70. Plaintiff owns a valid copyright in the Work, having registered the Work with the Register of Copyrights and owning sufficient rights, title, and interest to such copyright to afford Plaintiff standing to bring this lawsuit and assert the claim(s) herein.

71. As a result of Plaintiff's reproduction, distribution, and public display of the Work, Defendant had access to the Work prior to his own reproduction, distribution, and public display of the Work on his website, webpage, and/or social media.

72. Defendant reproduced, distributed, and publicly displayed the Work without authorization from Plaintiff.

73. By its actions, Defendant infringed and violated Plaintiff's exclusive rights in

violation of the Copyright Act, 17 U.S.C. § 501. Defendant's infringement was either direct, vicarious, and/or contributory.

74. Defendant's infringement was willful as he acted with actual knowledge or reckless disregard for whether his conduct infringed upon Plaintiff's copyright. Notably, Defendant himself utilizes a copyright disclaimer on his websites ("©2015 – 2021 Outer Places. All Rights Reserved." and "Donovan/Green © 2023"), indicating that Defendant understands the importance of copyright protection/ intellectual property rights and is actually representing that he owns each of the photographs published on his website. See, e.g., Bell v. ROI Prop. Grp. Mgmt., LLC, No. 1:18-cv-00043-TWP-DLP, 2018 U.S. Dist. LEXIS 127717, at *3 (S.D. Ind. July 31, 2018) ("[T]he willfulness of ROI's infringement is evidenced by the fact that at the bottom of the webpage on which the Indianapolis photograph was unlawfully published appeared the following: 'Copyright © 2017.' By placing a copyright mark at the bottom of its webpage that contained Mr. Bell's copyrighted Indianapolis Photograph, Mr. Bell asserts ROI willfully infringed his copyright by claiming that it owned the copyright to everything on the webpage."); John Perez Graphics & Design, LLC v. Green Tree Inv. Grp., Inc., Civil Action No. 3:12-cv-4194-M, 2013 U.S. Dist. LEXIS 61928, at *12-13 (N.D. Tex. May 1, 2013) ("Once on Defendant's website, Defendant asserted ownership of Plaintiff's Registered Work by including a copyright notice at the bottom of the page. Based on these allegations, the Court finds Plaintiff has sufficiently pled a willful violation…."). Defendant clearly understands that professional photography such as the Work is generally paid for and cannot simply be copied from the internet.

75. Alternatively, to the extent Defendant did not directly infringe Plaintiff's rights in the work, Defendant is liable for either contributory or vicarious copyright infringement.

76. As founder and CEO of Outer Places, Defendant owns, controls and/or manages the website https://www.outerplaces.com/. Defendant also continues to benefit from Outer

Places, by his use of it on Donovan/Green's website (at https://dgtwo.com/outer-places/).

77. Regardless of whether vicarious, direct, or contributory infringement occurred, Defendant had a direct financial interest. Defendant used the images for commercial purposes to promote his website and marketing company by utilizing the photograph of Steven Spielberg.

78. Plaintiff has been damaged as a direct and proximate result of Defendant's infringement.

79. Plaintiff is entitled to recover his actual damages resulting from Defendant's unauthorized use of the Work and, at Plaintiff's election (pursuant to 17 U.S.C. § 504(b)), Plaintiff is entitled to recover damages based on a disgorgement of Defendant's profits from infringement of the Work, which amounts shall be proven at trial.

80. Alternatively, and at Plaintiff's election, Plaintiff is entitled to statutory damages pursuant to 17 U.S.C. § 504(c), in such amount as deemed proper by the Court.

81. Pursuant to 17 U.S.C. § 505, Plaintiff is further entitled to recover his costs and attorneys' fees as a result of Defendant's conduct.

82. Defendant's conduct has caused, and any continued infringing conduct will continue to cause, irreparable injury to Plaintiff unless enjoined by the Court. Plaintiff has no adequate remedy at law. Pursuant to 17 U.S.C. § 502, Plaintiff is entitled to a permanent injunction prohibiting infringement of Plaintiff's exclusive rights under copyright law.

83. All conditions precedent to this action have been performed or have been waived.

**WHEREFORE**, Plaintiff demands judgment against Defendant as follows:

a. A declaration that Defendant has infringed Plaintiff's copyrights in the Work;

b. A declaration that such infringement is willful;

c. An award of actual damages and disgorgement of profits as the Court deems proper or, at Plaintiff's election, an award of statutory damages for willful infringement up to

   $150,000.00 for each infringement of the Work;

d. Awarding Plaintiff his costs and reasonable attorneys' fees pursuant to 17 U.S.C. § 505;

e. Awarding Plaintiff interest, including prejudgment interest, on the foregoing amounts;

f. Permanently enjoining Defendant, his employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries and assigns, and all those in active concert and participation with Defendant, from directly or indirectly infringing Plaintiff's copyrights or continuing to display, transfer, advertise, reproduce, or otherwise market any works derived or copied from the Work or to participate or assist in any such activity; and

g. For such other relief as the Court deems just and proper.

### Demand For Jury Trial

Plaintiff demands a trial by jury on all issued so triable.

Dated: September 22, 2023.

COPYCAT LEGAL PLLC
3111 N. University Drive
Suite 301
Coral Springs, FL 33065
Telephone: (877) 437-6228
dan@copycatlegal.com
christine@copycatlegal.com

By: /s/ Daniel DeSouza_____
   Daniel DeSouza, Esq.